IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| GILBERT P. HYATT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-1300 |
| | ) | |
| UNITED STATES PATENT AND | ) | |
| TRADEMARK OFFICE, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This § 706(1) APA[1] case, in which plaintiff alleges that the United States Patent and

Trademark Office ("PTO") has unreasonably delayed final agency action on 80 of plaintiff's

approximately 400 pending patent applications, is exceptional and unprecedented in several

respects. All 80 of the patent applications in issue have been pending before the PTO since at

least 1995, yet no patent has issued, nor have any applications been finally rejected. Moreover,

all 80 patent applications in issue include specifications of unprecedented length (well in excess

of 100 pages) and assert claims in unprecedented numbers (at one point, approximately 115,000

total). The parties point accusatory fingers at one another as the cause of the delay in the

prosecution of the 80 patent applications in issue. Plaintiff says that at various points the PTO

has deliberately declined to allow prosecution of the applications and has taken other steps to

halt the process. The PTO responds that responsibility for the delay in the process can be laid at

plaintiff's feet, as the length of the applications, the number of claims asserted, and the

interrelatedness of the claims are the causes and, in effect, constitute for plaintiff a self-inflicted

wound.

---

[1] Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*

The parties filed, briefed, and orally argued cross-motions for summary judgment, which are now ripe for disposition.

## I.

As plaintiff seeks judicial review under the APA, that review must be on the basis of the administrative record. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). The administrative record in this case gives fresh meaning to the word "voluminous;" the record is a total of several hundred thousand pages.[2] Of course, a complete summary of such a massive record is both impractical and unnecessary. Yet, it is both practical and useful to describe succinctly the record facts that are pertinent to the disposition of the parties' motions. Before stating these facts, a brief summary of the patent prosecution process is helpful to provide a context for understanding the record facts and the parties' dispute.

## A.

The PTO is responsible for "the granting and issuing of patents," which it does after conducting a thorough examination of patent applications in a process known as prosecution. 35 U.S.C. §§ 2(a)(1), 131. Prosecution begins with the submission of a "specification" containing a written description of the invention sought to be patented, the manner and process of making and using the invention, and concluding with "one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. §§ 111, 112.

On receiving a patent application, the PTO is statutorily required to "cause an examination to be made of the application and the alleged new invention." 35 U.S.C. § 131. Typically, such an examination is undertaken by a patent examiner with relevant scientific or

---

[2] *See* Transcript of Motions Hearing ("Tr.") at 7:21-23 (October 16, 2015).

technical competence, who reviews each proposed claim in the application for novelty, support in the specification's written description, and compliance with other patentability requirements and statutes. *See* 37 C.F.R. § 1.104(a)(1). After this initial examination, the examiner sends the applicant an "office action," which may allow or reject the patent claims. *See* 37 C.F.R. §§ 1.104, 1.111(a). If any claims are rejected, the applicant may respond with amendments, evidence of patentability, arguments in favor of patentability, or some combination thereof. 37 C.F.R. § 1.111(b) (stating that the applicant's reply must "specifically point[] out supposed errors in the examiner's action and must reply to every ground of objection and rejection in the prior Office action"). If the examiner concludes that the applicant is entitled to a patent, the examiner will issue a notice of allowance giving the applicant three months in which to pay an issue fee and a publication fee, payment of which generally results in final issuance of the patent. *See* 37 C.F.R. §§ 1.311, 1.314. In the course of prosecution, the examiner may issue a Requirement for Information directing the applicant to submit "such information as may be reasonably necessary to properly examine or treat the matter." 37 C.F.R. § 1.105(a)(1). In sum, patent examination is typically a back-and-forth, iterative process resulting ultimately in the patent examiner's allowing or rejecting one or more of the claims in the patent application.

In the event that one or more of the claims in the patent application have been twice rejected by the patent examiner, the applicant may appeal to the PTO Appeal Board. 35 U.S.C. § 134; 37 C.F.R. § 41.31. To appeal, the applicant must file a notice of appeal and then an appeal brief within two months of filing the notice. 37 C.F.R. §§ 41.31(a)(1), 41.37(a). Upon the filing of an appeal brief, the patent examiner may, "within such time as may be directed by the Director," file an "examiner's answer" setting forth the grounds on which the application was rejected and—potentially—"a new ground of rejection." 37 C.F.R. § 41.39(a). Section 1207.02

3

of the Manual of Patent Examination Procedure ("MPEP") recommends that a patent examiner "should furnish" this answer "within 2 months after the receipt of the [appeal] brief by the examiner." But significantly, there is no firm statutory or regulatory deadline for the filing of the examiner's answer. Once the answer is filed, the applicant must file a reply within two months. 37 C.F.R. § 41.41(a). Pursuant to PTO regulations, jurisdiction over the appeal does not pass to the Appeal Board until the filing of the applicant's reply brief or the expiration of time in which to file such a brief. 37 C.F.R. § 41.35(a). Thus, because there is no deadline or requirement for an examiner to file an answer, the examiner can halt an appeal simply by not filing an answer. Nor is this the sole means by which the appeal process can be stopped. After an applicant has filed an appeal brief but before jurisdiction passes to the Appeal Board, either the applicant or the examiner may re-open examination and prevent the Appeal Board from gaining jurisdiction over the application. *See* 37 C.F.R. § 41.35(b). In either case, the Appeal Board's jurisdiction never vests.

In the event the examination is not reopened and the Appeal Board acquires jurisdiction and affirms the examiner's rejection, that decision constitutes a final agency action which the patent applicant may then appeal to the Court of Appeals for the Federal Circuit or challenge in a civil action in federal district court. *See* 35 U.S.C. §§ 141(a), 145. If the Appeal Board disagrees with the rejection, it may reverse the decision or remand the application to the examiner. 37 C.F.R. § 41.50(a). Remand is not considered final agency action for purposes of appeal. 37 C.F.R. § 41.50(e).

**B.**

This saga begins in 1990 when plaintiff filed the first of the patent applications in issue in this suit.[3] But the primary period of activity and inactivity relevant to this case did not commence until 1995. Just prior to this date, Congress, in December 1994, amended certain important provisions of the nation's patent laws as part of the implementation of the Uruguay Round of the General Agreement on Tariffs and Trade ("GATT"). Specifically, Congress amended the provisions relating to patent terms.[4] Before the GATT, the term of a patent ran, in general, for seventeen years from the date the patent was *issued*. But as part of the GATT, Congress amended this provision to extend patent terms, in general, to twenty years from the date the application is *filed. See Gilead Scis., Inc. v. Lee*, 778 F.3d 1341, 1343-44 (Fed. Cir. 2015). Thus, as the effective date—June 8, 1995—of these patent law changes drew near, plaintiff, an engineer-inventor, began submitting substantial numbers of patent applications to the PTO.[5] Importantly, patent applications filed before the effective date of the GATT changes remain subject to the pre-GATT patent terms. *See Hyatt v. U.S. Patent & Trademark Office*, 797 F.3d 1374, 1377 (Fed. Cir. 2015). Thus, a patent issued for an application filed under the pre-GATT regime still receives a guaranteed term of seventeen years from the date of issuance.

---

[3] *See* Certified Index (Doc. 100), at 4 (hereinafter, "Certified Index"). The Certified Index sets forth the relevant actions, by plaintiff and the PTO, taken on each of the 80 patent applications in issue in this case.

[4] *See* Uruguay Round Agreements Act, Pub. L. No. 103-465, §§ 531-34, 108 Stat. 4809, 4982-90 (1994).

[5] Of the 80 patent applications in issue here, 79 were filed in 1995. Of these 79 applications, 63 were filed in June before the effective date of the patent reforms, 5 were filed in May, and 11 were filed in April. *See* Certified Index, at 9-548.

As originally filed, each of the 80 applications in issue contained approximately ███ to ███patent claims. Over time—and in significant part between ████████[6]—plaintiff repeatedly amended his patent applications, including the 80 patent applications in issue. In addition to changing the nature of the claims, plaintiff dramatically increased the total number of claims across the applications. For example, application ████████grew from ██ claims in 1995 to██ claims as of 2004; application ████████ grew from ██ claims in 1995 to██ claims as of 2006; and application ████████grew from ██ claims in 1990 to██ claims as of 2005.[7] The growth in the number of claims in these specific applications is generally characteristic of the growth in the number of claims for all of the 80 patent applications in issue. As such, the 80 patent applications in issue are exceptional in that they constitute some of the largest claim sets the PTO has ever encountered. And beyond the large number of claims added by plaintiff's amendments to the applications, the amendments also added significant complexity in terms of substantive changes made and the number of claims amended. For example, in this regard the PTO points to application ████████, in which plaintiff made significant amendments to ██ of ██ claims, and to application████████, in which plaintiff added ██new claims in addition to amending ██ of██already pending claims. *See* ████████ at A2397-2549; ████████ at A1392-1479. And in application ████████, the administrative record reflects that plaintiff went so far as to change the very nature of the invention claimed. *See* ████████ at A2473.

---

[6] *See, e.g.,* ████████ at A4210 (identifying this period as a time of significant expansion in terms of total number of claims).

[7] *Compare* ████████ at A655-664 (claims in 1995) *with id.* at A2025, 2075-2208 (same in 2004); *compare also* ████████ at A24-35 (claims in 1995) *with id.* at A2838-2944 (same in 2006); *compare also* ████████ at A210-232 (claims in 1990) *with id.* at A1995-2097 (same in 2005).

Of course, a patent application requires more than just a statement of claims; applications also require a specification, which includes "a written description of the invention, and of the manner and process of making and using it." 35 U.S.C. § 112(a). The vast majority of plaintiff's approximately 400 pending applications—including, but not limited to, the 80 patent applications in issue in this action—use only 12 distinct specifications. *See* ██████ at A4217. And despite the statutory requirement that such specifications must be "concise," 35 U.S.C. § 112(a), plaintiff's patent applications include specifications that run many hundreds of pages in length,[8] making them many times longer than even the 100 pages required to qualify an application as subject to special PTO fees. *See* 37 C.F.R. § 1.16(s).

Further adding to the complexity of plaintiff's 80 patent applications in issue is the fact that each application incorporates by reference, and claims the benefit of priority to, numerous earlier-filed applications often dating back to the early 1970s.[9] Indeed, the PTO observed that ████████████████████████████████████████████ ████████████████████████ at A4188. That is, the applications are deemed to have been filed as far back as ████████ for the purpose of evaluating whether the invention disclosed is "novel" and "non-obvious" for purposes of the Patent Act. *See* 35 U.S.C. §§ 102, 103 (requiring novelty and non-obviousness as conditions for patentability). And still further adding

---

[8] *See, e.g.,* ████████ at A10 (transmittal letter from plaintiff noting that the attached specification is ██ pages long); ████████ at A6 (transmittal letter from plaintiff noting that the attached specification is ██ pages long).

[9] *See, e.g.,* ████████ at A4187 ████████████████████████████████ ████████); *id.* at A4189 ████████████████████████████████████████ ████████████████████).

to the complexity is that plaintiff has in many instances filed identical or nearly identical claims across the applications in violation of PTO regulations.[10]

Over the course of the 20 or more years the patent applications in issue have been pending, the administrative record reflects that each of the applications has spent some time in examination before a patent examiner, some time on appeal in the PTO's administrative appeal process, and some time in a period of suspension. In fact, each of the 80 patent applications in issue spent between six and thirteen years in examination before an examiner, and each of the 80 applications received an adverse action entitling plaintiff to an appeal before the PTO Appeal Board. Although plaintiff appealed these adverse actions to the PTO Appeal Board, plaintiff's appeal briefs went unanswered, thereby stalling the prosecution process as the Appeal Board could not acquire jurisdiction without an examiner's answer.[11] That is, the examiners whose decisions at the examination stage were appealed to the Appeal Board declined to file briefs of their own defending their decisions. As a result, there were extended periods of inaction for the 80 patent applications in issue, even despite plaintiff's attempts to prompt the examiners to file answers.[12]

---

[10] It is worth noting that, in separate litigation, a unanimous panel of the Federal Circuit observed that plaintiff "has in numerous cases filed identical or nearly identical claims" and that "[t]his sort of redundant, repetitive claiming is inconsistent with [37 C.F.R. § 1.75(b)]." *See Hyatt*, 797 F.3d at 1384. Despite this conclusion, in this litigation plaintiff "disputes the PTO's representation that [plaintiff] has violated PTO regulations by filing repetitive claims." P. Opp. at 5, ¶ 8. The PTO, in turn, notes that asserting such disagreements without providing a basis or explanation is "characteristic" of plaintiff's overall approach to prosecuting his patent applications. D. Reply at 2 n.2.

[11] And as previously noted, there is no firm statutory or regulatory deadline for the filing of the examiner's answer to an applicant's appeal brief. *See supra*, Part I-A.

[12] *See, e.g.,* ▮▮▮▮ at A1313 (plaintiff's written petition for an examiner's answer in an appeal that had been filed ▮▮▮▮ months earlier).

Beginning in the mid-2000s, the PTO, without specific explanation, began to issue "suspensions" in each of the various applications.[13] The administrative record reflects that each of the 80 patent applications in issue was subject to between five and eighteen suspensions, generally for the maximum six-month period allowed. According to the PTO, the suspensions were in response to (i) the pendency of multiple proceedings before the Appeal Board and (ii) plaintiff's filing of multiple civil lawsuits against the PTO.[14] Specifically, the PTO now contends that the collective outcome of these proceedings would have directly affected the examination of plaintiff's pending patent applications. Although plaintiff disputes the PTO's argument as a *post hoc* justification, there is no dispute that in October 2012, approximately six months after plaintiff prevailed in the last of his civil actions against the PTO, the PTO dedicated twelve full-time patent examiners to the sole task of examining plaintiff's patent applications.

In August 2013, almost a year after commencement of the PTO's renewed efforts to examine plaintiff's patent applications, the PTO began issuing a series of Requirements for Information ("Requirements") applicable to plaintiff's patent applications, including for each of the 80 patent applications in issue. The Requirements recite the "confluence of multiple factors"

---

[13] *See, e.g.,* Certified Index, at 547 (listing eight letters of suspension in the ▮▮▮▮▮ patent application between 2007 and 2012); ▮▮▮▮▮ at A3902 ("A court decision relevant to the examination of this application will be rendered soon. Ex parte prosecution is SUSPENDED FOR A PERIOD OF 6 MONTHS from the date of this letter.").

[14] The PTO cites three of plaintiff's civil lawsuits as relevant to the decision to suspend action on his patent applications. In chronological order of resolution, these lawsuits are *Hyatt v. Dudas*, 492 F.3d 1365 (Fed. Cir. 2007) (rejecting plaintiff's challenge to an examiner's rejection of claims due to lack of written description), *Hyatt v. Dudas*, 551 F.3d 1307 (Fed. Cir. 2008) (requiring the PTO to consider all grounds for rejection challenged by plaintiff instead of selecting one claim as representative of a group of claims that were rejected on different grounds), and *Kappos v. Hyatt*, 132 S. Ct. 1690 (2012) (holding that in a civil action against the PTO Director to obtain a patent there are no limitations on the applicant's ability to introduce new evidence except those in the Federal Rules of Evidence and Federal Rules of Civil Procedure).

that made examination of plaintiff's applications, in the PTO's view, "unmanageable,"[15] namely

(i) the number of pending applications in the same "family" of applications, (ii) the length of the

specifications and number of applications incorporated by reference, (iii) the degree of overlap in

priority with other applications and with patents already issued to the same specification, (iv) the

number of claims, (v) the multiplication of claims over the course of prosecution, (vi) the

similarity of claims, and (vii) the lack of clear demarcation between the claims in applications

sharing a common specification. *See, e.g.,* ▮▮▮▮ at A4187-4209. The Requirements go on

to explain that maintaining a clear mental picture of the thousands of independent claims drawn

to a common specification is "not feasible" and that "attempting to hold in mind the delineations

created by the 45,000 independent and 115,000 total claims across all 399 applications in the

extended family is simply impossible." *Id.* at A4210. Moreover, in the PTO's view these

problems made examination "inefficient" and "impractical." *Id.* To remove these barriers to

effective examination, the Requirements instructed plaintiff to (i) select a number of claims from

each "family" (*i.e.*, group of related claims), not to exceed 600 claims absent a showing that

more claims are necessary, (ii) identify the earliest possible priority date and supporting

disclosure for each selected claim, and (iii) present a copy of the selected claims to the PTO. *See,

e.g., id.* at A4212-4215. The Requirements also reopened examination for most of the 80 patent

applications in issue, placing the applications back before a patent examiner.[16] Plaintiff has

complied with the Requirements under protest.[17]

---

[15] *E.g.,* ▮▮▮▮ at A4187.

[16] Only ▮ of the 80 patent applications in issue were expressly reopened for examination by the
Requirements. In the remaining ▮ patent applications, the PTO had previously issued
Requirements, and the PTO views those previous Requirements as having already reopened

In the wake of the issuance of the Requirements, the PTO has now ███████

███████████████████ of the 80 patent applications in issue, often on grounds different from

the grounds on which the PTO relied in rejecting the claims before the Requirements issued.

Although some of these grounds for rejection are subject to the same arguments that plaintiff

made in his unanswered pre-Requirements briefing, the PTO has rejected plaintiff's petitions

asking that the PTO consider his already briefed arguments. *See, e.g.,* ███████ at A5204-05

(plaintiff's petition); *id.* at A5207-08 (PTO's dismissal of the petition).

Currently, there are fourteen full-time patent examiners dedicated to examining plaintiff's

patent applications (up from the twelve initially dedicated to the task in 2012).[18] As of September

3, 2015, the PTO has taken non-final office action on ██ of the 80 patent applications in issue;

plaintiff has responded to ██ of these actions; the PTO has replied to ██ of these responses; and

final office action has resulted on ██ of these applications. D. Ex. 18. The PTO further represents

that, as of October 16, 2015, there were ██ applications that plaintiff could appeal to the Appeal

Board immediately. Tr. 15:7-10. In addition, there are ██ other applications that plaintiff could

have appealed to the Appeal Board, but plaintiff instead elected to continue prosecution before

an examiner.[19] Tr. 15:17-22.

---

examination. Regardless, the PTO represents that, as a practical matter, examination has been
reopened in all 80 patent applications in issue. *See* Doc. 42, at 10 n.6.

[17] It should be noted that plaintiff challenges the legality of the Requirements. *See, e.g.,* P. Reply
at 11. However, plaintiff expressly disavows that he is challenging the substance of the
Requirements in this litigation. *Id.* Accordingly, it is unnecessary to consider or to decide here
whether the Requirements are lawful.

[18] *See* Declaration of Gregory Morse, at ¶ 1 (D. Mot. Summ. J. (Doc. 114), Ex. 18) (hereinafter,
"D. Ex. 18").

[19] After an initial rejection, the ordinary course is for the applicant to amend the application or
present some basis challenging the examiner's conclusion. After a second rejection by an
examiner, an applicant has the right to appeal. For plaintiff, the PTO has determined that the pre-

Finally, the PTO represents that, going forward, the PTO's plan with regard to the 80 patent applications in issue consists of:[20]

- Responding within six months to all compliant responses from plaintiff regarding PTO initial office action;

- Taking office actions at a rate of approximately 10 per month on applications in which plaintiff responds to the Requirements;

- Responding (subject to the volume of appeal briefs plaintiff files in any short period of time) to plaintiff's appeal briefs in the administrative appeal process (i) within two months, if the briefs are shorter than fifty pages (which is twice the size of a typical appeal brief) or (ii) within six months, if the briefs are longer (which is possible, as plaintiff's historical practice has been to file briefs many hundreds of pages long[21]);

- Expediting plaintiff's appeals by issuing decisions within 18 months of the date on which the appeal is docketed (which is approximately six months shorter than the average pendency of an appeal); and

- Not suspending examination of plaintiff's pending applications, barring unforeseen circumstances.

Plaintiff, in turn, argues that these representations are not enough. Accordingly, plaintiff seeks (1) a declaration that the PTO has unreasonably delayed final agency action on the 80 patent applications in issue and (2) injunctive relief compelling agency action. Specifically, plaintiff requests an order (i) prohibiting the PTO from suspending action in any of the 80 patent applications in issue and (ii) barring the PTO from raising new grounds for rejection of the 80 patent applications in issue once plaintiff files an appeal brief relating to a patent application

---

Requirements rejections count as an initial rejection of the claims. Tr. 41:5-9. Given that plaintiff's post-Requirements applications are in many substantial respects different than the pre-Requirements applications previously pending before the Appeal Board, this policy, in essence, affords plaintiff a fast-track to the Appeal Board.

[20] D. Mot. Summ. J. (Doc. 114), at 10-12.

[21] *See, e.g.,* ▮▮▮▮ at A2849-4167 (appeal brief and appendices totaling ▮▮▮ pages).

before the PTO Appeal Board or, in the alternative, (iii) barring the PTO from reopening prosecution on the PTO's own initiative once plaintiff files such an appeal brief.

## II.

In an APA suit challenging agency action,[22] review is limited to the administrative record and "resolution...does not require fact finding on behalf of [the] court." *Nw. Motorcycle Ass'n*, 18 F.3d at 1472. Accordingly, the ordinary summary judgment standard under Rule 56(c), Fed. R. Civ. P., does not apply. In other words, the presence or absence of a genuine dispute of material fact is not in issue, as the facts are all set forth in the administrative record. Rather, in an APA agency review case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).

## III.

Under the APA, federal courts have the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Accordingly, § 706(1) allows a court to compel agency action that has been delayed without adequate reason or justification. To determine whether delay is justified—and, by extension, reasonable—courts routinely employ a multi-factor standard rather than a firm rule. *See Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*"). Specifically, the D.C. Circuit in *TRAC* concluded that the time an agency takes to make a decision should be governed by a "rule of reason." *Id.* The content of a rule of reason can sometimes be supplied by a congressional indication of the speed at which the agency should act. *Id.* Moreover, the reasonableness of a delay will differ based on the nature of the regulation; that is, an unreasonable delay on a matter

---

[22] For purposes of the APA, "failure to act" constitutes "agency action." 5 U.S.C. § 551(13).

affecting human health and welfare might be reasonable in the sphere of economic regulation. *See id.* In assessing reasonableness, courts consider the effect of expediting delayed actions on agency activity of a higher or competing priority, but courts also consider the extent of the interests prejudiced by the delay. *See id.* Finally, a finding of unreasonableness does not require a finding of impropriety by the agency. *Id.*

Although the D.C. Circuit conceded that the *TRAC* standard "suffers from vagueness," *id.*, the consequences of the standard have become pellucid over time: "It is hard for a petitioner to prevail under this deferential standard, and most do not."[23] As one commentator facetiously observed in a different context, one might trace the decline and fall of American English to the rise of linguistic vagueness.[24] One might similarly be tempted to attribute the decline and fall of successful petitions for § 706(1) review to the rise of *TRAC*. But the difficulty in obtaining relief under § 706(1) is actually attributable to a much older source—the writ of mandamus—to which relief under § 706(1) is functionally identical. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (noting that § 706(1) "carried forward the traditional practice prior to its passage, when judicial review was achieved through the use of…writs of mandamus.").[25]

---

[23] 2 Richard J. Pierce, Jr., Administrative Law Treatise § 12.3 (4th ed. 2002).

[24] *See* Clark Whelton, What Happens in Vagueness Stays in Vagueness, City Journal, Winter 2011.

[25] Other courts have similarly acknowledged that the standard for obtaining relief under § 706(1) is the same as the standard for obtaining mandamus. *See, e.g., In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) ("The central question in evaluating 'a claim for unreasonable delay' is 'whether the agency's delay is so egregious as to warrant mandamus.'"); *Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (noting that the standard to grant mandamus and the standard to compel agency action under § 706(1) are "essentially the same"); *Citizens for Responsibility & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 151 (D.D.C. 2013) ("The standards for APA relief under § 706(1) and for mandamus here are identical.").

It is axiomatic that mandamus is a "drastic remedy" that is only warranted in "extraordinary situations." *In re Beard*, 811 F.2d 818, 826 (4th Cir. 1987). As the Fourth Circuit has explained, "[c]ourts are extremely reluctant to grant a writ mandamus," and "[s]uch a decision is largely a matter of discretion with the court." *Id.* at 827. Thus, a party seeking mandamus "carries the heavy burden of showing that he has 'no other adequate means to attain the relief he desires' and that his right to such relief is 'clear and indisputable.'" *Id.* at 826 (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980)). In other words, mere abuse of discretion is insufficient to establish a right to this extraordinary relied. *Cf. id.* ("mandamus will not issue when all that is shown is that the district court abused its discretion").

Although the parties focused their summary judgment arguments in large part on the *TRAC* factors, the proper focus for the § 706(1) analysis in this case is not whether unreasonable delay occurred, when unreasonable delay occurred, who or what caused the unreasonable delay, or why; rather, the proper focus for the analysis is the current patent application examination landscape. The facts of this case present a unique and seemingly unprecedented situation, namely significant past delay during an iterative, back-and-forth process but current and ongoing progress. Indeed, an impartial review of the administrative record makes it clear that neither party wears a completely white hat in this case, complicating any determination about the reasonableness of past delay. Moreover, the *TRAC* factors do not necessarily fit comfortably with the facts here; *TRAC* reviewed agency action in which there was no back-and-forth between the petitioners for review and the agency, making it clear that all delay was taxable to the agency. *See* 750 F.2d at 72-74. Because no such clarity exists on this administrative record, both because of the distinctly interactive nature of the patent application process and the unexpected and unprecedented difficulties presented by the length and complexity of plaintiff's applications, the

15

reasonableness analysis is far more complex here. Yet whether the current state of affairs—in which agency action is ongoing—warrants mandamus presents a much clearer issue. Accordingly, on the facts of this case it makes the most sense to begin not by looking at the past and assigning fault for delay but by looking at the present and asking whether there is anything a court should lawfully and discretionarily compel. And of course, a negative answer to the latter question obviates the need to engage in the task of examining with respect to the 80 patent applications in issue whether an unreasonable delay occurred and which party bears primary responsibility.

In light of the forgoing, § 706(1) analysis in this case properly begins by identifying the agency action to which plaintiff claims entitlement. This is important because there can be no "clear and indisputable" right to compel agency action that the law does not require. *See Norton*, 542 U.S. at 63 ("[T]he only agency action that can be compelled under the APA is action legally *required*.") (emphasis in original). Thus, if an agency is not withholding that which the law requires, there is no remedy under § 706(1), even if the agency action has not been in the past— or is not currently—the most efficient. *Cf. In re Beard*, 811 F.2d at 826 (noting, in the judicial context, that mere abuse of discretion is insufficient to warrant mandamus).[26] These principles, applied here, point convincingly to the conclusion that relief under § 706(1) is unwarranted in this case.

What the law *requires* of the PTO with respect to patent applications is clear and straightforward:  When a patent application is submitted, "[t]he Director [of the PTO] shall cause

---

[26] Although the analogy of mandamus review of judicial decisions to mandamus review of agency decisions is obviously not a perfect one, the operative principle is the same in both contexts: agencies, like courts, are not held to the standard of making the perfect choice at every turn, and some errors in judgment are not amenable to judicial intervention from above.

an examination to be made of the application and the alleged new invention; and if on such examination it appears that the applicant is entitled to a patent under the law, the Director shall issue a patent therefore." 35 U.S.C. § 131. In other words, there are two actions that § 131 requires of the PTO: (i) causing an examination to be made of the patent application and (ii) issuing a patent if the applicant is legally entitled to one. There is no suggestion in this case that plaintiff is legally entitled to a patent. Rather, plaintiff complains about the delay in moving his patent applications through the prosecution process.

A sharp focus on the language of § 131—which requires the PTO to "cause an examination to be made"—is critically important to the analysis. Under § 706(1), a court is empowered to act only to compel the specific action to which the petitioner for relief has a right. Thus, if the administrative record showed that the 80 patent applications in issue were currently in limbo before the Appeal Board awaiting examiners' answers that might never come, then plaintiff might have a claim that the PTO was failing to cause his applications to be examined. Similarly, if the administrative record showed that the 80 patent applications in issue were currently languishing in an ongoing state of suspension, then plaintiff might have a claim that the PTO was failing to cause his applications to be examined. But the administrative record reflects no such thing; instead, the administrative record shows that the PTO has placed all 80 of plaintiff's patent applications in issue in front of an examiner for examination. Thus, the PTO has already done what it is statutorily required to do, namely to cause an examination of the applications. Indeed, the Requirements expressly state that they were issued to achieve this very purpose.[27] Simply put, at this stage of the administrative proceedings there is no agency action to

---

[27] *See, e.g.,* ▮▮▮▮▮ at A4217 (referencing "the obligation of the Director to cause an examination to be conducted" as the justification for the Requirements).

compel because the administrative record clearly shows that the PTO is now doing all that it is required to do.

Plaintiff argues that "[t]he PTO's recent activity in [plaintiff's] 80 patent applications does not remedy the agency's delay or render its treatment of those applications over the full course of the pendency 'reasonable.'" P. Br. at 19. Indeed, plaintiff contends that the course of action the PTO elected to take—reopening prosecution in the wake of the Requirements— exacerbates the delay until final agency action occurs on the 80 patent applications in issue. This argument is of no moment. First, plaintiff's argument focuses on the wrong action; § 706(1) is concerned with what the law requires, which here is causing an examination to be made, not completing final agency action on any specific timeline.[28] Because the law requires the PTO to cause an examination of a patent application to be made, and because examinations of the 80 patent applications in issue are actively underway, there is nothing to be judicially compelled. To be sure, plaintiff may very well be correct in the sense that the PTO's current actions are not a "remedy" for past unreasonable delay in that the PTO cannot cure any prejudice or harm caused by the past delay. But § 706(1), because it is in the nature of mandamus, is a narrow grant of remedial power designed to afford relief for current delay that is inconsistent with legal obligations, not a free reign to craft a perfect remedy to solve all past transgressions.

Moreover, it is important to note that the PTO is under no legal obligation to cause an expeditious—or even an efficient—examination of a patent application. In the course of arguing

---

[28] Plaintiff notes in his reply brief that "the Court has already held," at the motion to dismiss stage, that a "challenge [to] the PTO's unreasonable delay in reaching a final agency action...is an appropriate request under § 706(1)." P. Reply at 11 (citing *Hyatt*, 2015 WL 3495005, at *5-6). Although it is certainly true that requesting "a final decision on plaintiff's 80 patent applications meets the requirements for subject matter jurisdiction under § 706(1)," *Hyatt*, 2015 WL 3495005, at *6, that statement simply addresses the *right to relief*; it does not address or decide whether relief should issue.

that past PTO delay has been unreasonable, plaintiff suggests that in Congress's judgment a

patent application should generally not spend more than three years under examination. In

support of this argument, plaintiff notes that the current patent statute (not applicable to

plaintiff's pre-GATT patent applications) grants a one-day extension of the patent term for every

day beyond three years that an application spends in examination, subject to certain limitations.

*See* 35 U.S.C. § 154(b)(1)(B). Of course, § 154(b)(1)(B) is not a deadline, nor is it an admonition

to the PTO, nor even an express statement of some aspirational goal; rather, it is a means by

which to avoid prejudice to inventors as a result of slow-moving prosecutions. That Congress

avoided setting a deadline, giving an admonition, or stating an aspiration makes perfect sense in

light of the special nature of PTO action. A patent is a monopoly, and the PTO must be rigorous

in its examination to ensure that improper patents do not issue, as an improper grant of a

monopoly could wreak havoc on the markets.[29] This is all the more important and true given that

Congress expressly provides that "[a] patent shall be presumed valid" and "[e]ach claim of a

patent...shall be presumed valid independently of the validity of other claims." 35 U.S.C. §

282(a). Put very simply, a patent is a big deal. In light of this, the reasonable conclusion to draw

is not that Congress desires expediency and efficiency for expediency's or efficiency's own sake.

To the contrary, Congress wants the PTO to do its job thoroughly and to issue only patents that

are valid. That is, Congress wants *effective* review. And absent statutory instruction to the

contrary, it is for the PTO to decide how to effectuate Congress's goal as to a given claim set.

Thus, even if a court were to disagree with the PTO's decision to cause an examination in a

certain manner—for example, through the Requirements approach taken in this case—that

---

[29] *See Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354-55 (2014) (noting the importance of constraining "the monopoly granted under our patent laws" to the proper sphere).

disagreement with the PTO's decision is not sufficient, absent some contrary legal edict, to interfere with the agency's process. *Cf. In re Ralston Purina Co.*, 726 F.2d 1002, 1005 (4th Cir. 1984) (holding, in the judicial context, that "abuse of…power, not merely abuse of discretion" is necessary for mandamus).

Plaintiff's reliance on the Fourth Circuit's decision in *Deering Milliken, Inc. v. Johnston*, 295 F.2d 856 (1961), does not alter the analysis or the result reached here. In *Deering Milliken*, the plaintiff challenged as unreasonable delay the National Labor Relations Board's ("NLRB") remanding a case to a regional director for the purpose of conducting further hearings. *See id.* at 858-60. Specifically, the plaintiff alleged that the new hearing was in large part duplicative of previous hearings held on a previous remand. *See id.* at 860. The Fourth Circuit, relying on § 6(a) of the APA,[30] concluded that an employer in a labor relations dispute had a right to be "free from required participation in supplemental hearings which are repetitive, purposeless, and oppressive, when the conduct of the hearings constitutes a failure to conclude the proceedings with reasonable dispatch." *Id.* at 868. Even so, the Fourth Circuit noted that "[w]hat is reasonable can be decided only in the light of the nature of the proceedings and the general and specific problems of the agency in discharging its functions and duties." *Id.* at 867.

This case is readily distinguishable from *Deering Milliken*. First, *Deering Milliken* was about an agency adjudication of a charge of an unfair labor practice—the focus was on determining a liability, not conferring a benefit (*e.g.,* a patent). This matters because APA § 6(a), on which the Fourth Circuit relied, deals with the rights of "person[s] compelled to appear in person before an agency or representative thereof." 5 U.S.C. § 555(b). Thus, the Fourth Circuit's entire analysis in *Deering Milliken* rested on a provision of the APA that, read as a whole,

---

[30] Section 6(a) is now codified, as revised, at 5 U.S.C. § 555(b).

applies to agency adjudications of liability.[31] Even setting aside this legal distinction from the

case at hand, the factual context is entirely different. While the remand hearings in *Deering*

*Milliken* were "repetitive, purposeless, and oppressive," the new round of PTO examinations in

this case, by contrast, serves a useful purpose. Although plaintiff is correct that the PTO was able

to move the pre-Requirements patent applications through prosecution and advance them to the

Appeal Board, the PTO has essentially conceded a defect in its initial review, noting that it was,

*inter alia*, "impossible" to review so many interrelated claims effectively. *See, e.g.,* ████████

at A4210. By directing plaintiff to reduce the number of claims under review, the Requirements

facilitate effective examination of the relevant patent applications. Thus, unlike the NLRB in

*Deering Milliken*, the PTO in this case is not just retreading the same ground as before. Rather,

because the post-Requirements patent applications are materially different from their pre-

Requirements counterparts, a new round of examination is necessary to fulfil the statutorily

mandated goal of effective review.

  Plaintiff understandably expresses concern that, in the absence of the relief plaintiff

seeks, the PTO will continue employing the same tactics that, in plaintiff's view, have caused

delay in the past. Thus, plaintiff seeks an order enjoining the use of those tactics, *i.e.*, an order

prohibiting the PTO from suspending activity on the 80 patent applications in issue and further

prohibiting either raising new grounds for rejection once an appeal brief is filed or unilaterally

reopening examination once an appeal brief is filed. The PTO objects that § 706(1) only allows a

court to compel action, not to *constrain* how the action is carried out. While the PTO is correct to

---

[31] *See also TRAC*, 750 F.2d at 79 (relying on APA § 6(a) when reviewing the FCC's delay in
determining whether AT&T must reimburse ratepayers for allegedly unlawful overcharges).

focus on the precise language of § 706(1), "to compel" can mean "to constrain."[32] Indeed, if the administrative record showed that plaintiff's applications were currently in a state of ongoing, unreasonable suspension, an order enjoining—and thereby constraining—further unwarranted suspensions might be appropriate and would have the effect of compelling an examination upon the expiration of the suspensions.

Yet, the fact that § 706(1) allows courts to constrain agency activity as a remedy for unreasonable delay does not mean that courts are given *carte blanche* to do so. As discussed *supra*, an appropriate remedy under § 706(1) must focus sharply on what the law actually requires of the agency. Because the law merely requires that the PTO cause an examination to be made, and because the administrative record reflects that examinations are currently and actively underway, aided by the Requirements, no further constraint is warranted. Plaintiff has no right to an examination free from suspensions, new grounds for rejection, or reopened prosecution;[33] plaintiff's right is merely to an examination of his patent applications. Simply put, the remedy for unreasonable delay under § 706(1) is action, not preferential treatment.

Because the statutorily required action—examination of plaintiff's 80 patent applications in issue—is already actively underway, there is nothing for a court to compel. The absence of a remedy eliminates the need to determine whether past delays, if any, were unreasonable.[34]

---

[32] *See, e.g.,* The American Heritage College Dictionary 284 (3d ed. 1993) (defining "compel" as "[t]o force, drive, or constrain"); Webster's II New Riverside University Dictionary 290 (1984) (same).

[33] In fact, these actions are all expressly contemplated by the PTO's rules and regulations. *See* 37 C.F.R. § 1.103(e) (suspension on initiative of the PTO); 37 C.F.R. § 41.39(a)(2) (new grounds for rejection in an examiner's answer); MPEP (9th ed. Rev. 7.2015, Nov. 2015) § 1207.04 (reopening of prosecution after appeal).

IV.

In addition to injunctive relief, plaintiff seeks a declaration that the PTO has unreasonably delayed final action on each of the relevant patent applications. This relief, too, must be denied.

The Federal Declaratory Judgment Act ("Act") provides that "any court of the United States…may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The power conferred under the Act is discretionary. *Centennial Life Ins. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996). Yet the exercise of discretion is not unbridled; the "principal criteria" for conducting the declaratory judgment analysis are (i) whether a declaration would serve a useful purpose in clarifying and settling the legal relations in issue and (ii) whether a declaration will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. *See Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937). And when both of the principal criteria are met, "a district court is obliged to rule on the merits of a declaratory judgment action." *See Volvo Constr. Equip. N.A., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004).

Plaintiff argues that a declaration of unreasonable delay by the PTO would supplement an injunction under § 706(1) by preventing the PTO "from evading the effects of a Court order by citing prosecution laches to prevent a patent from issuing in the first place." P. Reply at 20. As relevant here, the doctrine of prosecution laches allows the PTO to reject patent applications based on "unreasonable and unexplained delay in prosecution, even though the patent applicant complied with pertinent statutes and rules." *In re Bogese*, 303 F.3d 1362, 1367 (Fed. Cir. 2002).

---

[34] *Cf. TRAC*, 750 F.2d at 80 (declining to examine whether past delay warrants mandamus where the agency was presently moving at a sufficient pace).

In holding that the PTO possesses such authority, the Federal Circuit expressly held that "a delay by the PTO cannot excuse the [applicant's] own delay." *Id.* at 1369.

No doubt, plaintiff has reasonable grounds on which to harbor "uncertainty" or "insecurity" about the prospect of prosecution laches. Indeed, the PTO has █████████ ██████████████████████████████████████████████████ *See, e.g.,* ████████ at A5239 n.6. But a general declaration will afford no relief from this uncertainty or insecurity, as the PTO can still invoke the doctrine of prosecution laches on the basis of plaintiff's own delays. *See In re Bogese*, 303 F.3d at 1369. Thus, a general declaration that the PTO has engaged in unreasonable delay will not necessarily eliminate the specter of prosecution laches. And, for related reasons, a declaration would serve no "useful purpose in clarifying and settling the legal relations" of the parties. This is so because delay by the PTO is not dispositive to whether the PTO can apply prosecution laches generally, and hence will do nothing to clarify whether the PTO can apply prosecution laches to plaintiff's patent applications specifically.

Moreover, the current administrative record does not reflect that the PTO has actually applied prosecution laches to any of the 80 patent applications in issue. If and when the PTO chooses to do so with regard to any given patent application, plaintiff has an avenue of redress in the form of an action to set aside the PTO's action as "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A); *In re Bogese*, 303 F.3d at 1366 (reviewing application of prosecution laches under APA § 706). And such a challenge will have the added benefit of a focused record, *i.e.*, an administrative record consisting only of the actions relevant to the rejected patent application as opposed to an administrative record spanning several hundred thousand pages. Thus, not only would a declaration fail to fulfill the principal goals of the Act,

there are sound prudential reasons to prefer targeted review of the application of prosecution laches to a given patent application if and when such application occurs.

Accordingly, it is appropriate to decline the exercise of declaratory judgment jurisdiction is this case. As such, there is once again no need to determine the reasonableness of the past delay on the prosecution of plaintiff's 80 patent applications in issue.

## V.

In the end, there is in this case no appropriate remedy for past unreasonable delay, if any occurred, that would be consistent with the strict requirements for judicial relief under APA § 706(1). The conclusion that the current administrative record does not support a remedy obviates the need to determine whether any past unreasonable agency delay occurred, when, and who is responsible. Nor, for the foregoing reasons, is this a case in which declaratory relief is appropriate. Accordingly, plaintiff's motion for summary judgment must be denied, and the PTO's motion for summary judgment must be granted.

An appropriate order will issue.

Alexandria, Virginia
November 12, 2015

/s/

T. S. Ellis, III
United States District Judge